Howard J. BOSSCHER, Plaintiff,

v.

TOWNSHIP OF ALGOMA, Algoma Township Planning Commission, Planning Commission Members Ed Wolven, Bob Newberger, Jack Poolman, Deborah Ellenwood, Dale Heminger, Tyler Lecceadone, and Jack Witham, in their official capacities, Defendants.

No. 00–CV–806.

United States District Court, W.D. Michigan, Southern Division.

Jan. 3, 2003.

Earl E. Erland, Grand Rapids, MI, for Plaintiff.

David K. Otis, Plunkett & Cooney, PC, Lansing, MI, Michael S. Bogren, Plunkett & Cooney, PC, Kalamazoo, MI, for Defendants.

## OPINION

McKEAGUE, District Judge.

This case involves allegations of federal preemption and deprivation of federal rights by plaintiff Howard J. Bosscher ("plaintiff" or "Bosscher") against defendants Township of Algoma, Algoma Township Planning Commission, and Commission members Ed Wolven, Bob Newburger, Jack Poolman, Deborah Ellenwood, Dale Heminger, Tyler Lecceadone, and Jack Witham (collectively "defendants"). Now before the Court are defendants' motion for dismissal on Counts II, III, and IV and cross-motions for summary judgment on Count I of plaintiff's complaint. The Court held hearings on defendants' motion to dismiss on June 10, 2002, and on the motions for summary judgment on October 15, 2002. After a complete review of the record and the parties' arguments, the Court finds that defendants' motions to dismiss and for summary judgment will be granted.

## I. Background

Plaintiff is licensed by the Federal Communications Commission (FCC) as an amateur radio operator, or HAM. HAM radio operators communicate with one another through the use of low power fixed or mobile transceivers, sometimes connected to an amplifying antenna or tower. While amateur radio signals "travel" in many different ways—including bouncing off the

sun—two of the most common, simplex and repeater, are of particular interest in this case. Simplex radio signals travel directly, or "point to point," from one operator to another on any one of number of frequencies from which they may choose. Essential to simplex communication is that the radio signal travel "line of sight" directly from one operator to another without obstruction by land, trees, or buildings.

By contrast, repeaters are intermediaries that "bounce" an amateur radio transmission from the sender to other operators. This method allows two operators who cannot establish simplex, either due to topographical or technical restrictions, to communicate with one another. While repeaters greatly expand communications opportunities for amateur radio operators, they come with an inherent limitation. Unlike simplex, where operators may communicate on any one of a number of frequencies, each repeater operates only on a specified frequency. As a result, only one conversation may occur at a time and others desiring to use the repeater must wait their turn.

In this case, plaintiff owns and resides on a parcel of property located in Algoma Township, Michigan. This property is situated 792 feet above sea level, and is bordered 2.72 miles to the south by a ridge that rises 906 feet above sea level. This ridge is further heightened by a tall stand of trees, and separates plaintiff's property from Grand Rapids, Michigan, the largest city on the western side of Michigan's lower peninsula.

Desiring to communicate via simplex from his property to HAM operators in the Grand Rapids area south of this ridge, plaintiff retained the services of radio and tower consultant Richard Castanie. After conducting a topographical study of the local area and considering the equipment and frequencies the plaintiff desires to use, Castanie recommended that he construct a 185 foot tall tower in order to effectively and reliably transmit a simplex radio signal from his property over the ridge to the south to HAM operators in and around Grand Rapids.[1]

On the basis of Castanie's report, plaintiff submitted to the Algoma Township Planning Commission ("Planning Commission" or "Commission") on December 27, 1999, an application for a special use permit to construct a 180 foot tall tower on his property. Algoma Township ordinances require any resident to wishing to construct a tower in excess of 50 feet to obtain a special use permit. See Algoma Township Ordinance § 4.30. Supporting documents indicated that plaintiff's intended use for the tower was personal communication with other amateur radio operators. In addition, plaintiff had signed a letter of intent to lease space on this proposed tower to the Grand Rapids Area Amateur Radio Association (GRARA) for installation of a repeater system.

The Planning Commission first considered plaintiff's application at its January 18, 2000, meeting. Various Commission members expressed concerns to plaintiff and the GRARA regarding the use of the proposed tower as a repeater, its visual impact on the area (particularly the "Vista View Overlay Zone," a protected area adjacent to US–131, which is the major north-south highway from Cadillac to the north and Grand Rapids to the south), and its incompatibility with existing local zoning. The Commission voted to table the

---

**1.** Plaintiff is the owner of a 195 foot tower given to him as a gift by his son, and has access to another 120 feet of tower if needed.

application for further study and to receive more information from plaintiff.

The Commission next took up plaintiff's application at its March 21, 2000, meeting, where it heard from Castanie regarding his report and the technical and topographical limitations of amateur radio. Ultimately, the Commission voted to retain a professional consultant to review plaintiff's application, Castanie's report, and to conduct an independent study of the issue. Several days later the Commission hired Radio North LLC, represented by Max Machuta, to perform this analysis.

The Planning Commission only briefly discussed plaintiff's application at its April, May, and June 2000 meetings, mainly requesting that plaintiff provide information to Radio North for use in its analysis. Radio North issued a report on July 10, 2000, concluding that there were several existing tower sites in the local area that were set on high terrain and would be suitable for housing a repeater system that would serve plaintiff's needs. Radio North further noted that plaintiff, by using a 60 foot tower and that repeater system would enjoy "very suitable coverage."

Considering Radio North's report and plaintiff's objections to the report at its July 18, 2000, meeting, the Commission voted to deny the application for a special use permit. Following the meeting the Commission issued written findings of fact in support of its decision. Plaintiff then filed this action.

## II. Standard of Review

The Court may dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint." *Zolman v. Internal Revenue Serv.*, 87 F.Supp.2d 763, 764 (W.D.Mich.1999) (citations omit-

ted). In ruling on the motion, the Court "must construe the complaint in the light most favorable to the plaintiff, accept[ing] all factual allegations as true." *Id.* (citations omitted); *see In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997), *cert. denied*, 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998).

As to the cross-motions for summary judgment under Federal Rule of Civil Procedure 56, the Court must look beyond the pleadings and evaluate the facts to determine whether there is a genuine issue of material fact that warrants a trial. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact concerns "material" facts only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Id.*

When reviewing the pleadings and other submissions on summary judgment, the Court must draw all reasonable inferences in the light most favorable to the nonmovant. *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 842 (6th Cir.1997). A complete failure of proof concerning an essential element necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. A party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. Analysis

### A. Substantive and Procedural Due Process

■ Plaintiff alleges that defendants' denial of his application for a special use permit deprived him of constitutionally-protected substantive and procedural due process rights enforceable under 42 U.S.C. § 1983. Section 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws of the United States." 42 U.S.C. § 1983.

■ Due process under the Fourteenth Amendment has both substantive and procedural aspects. Substantive due process "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)(emphasis in original). "Fundamental" liberties are those which are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)(internal quotation marks and citations omitted); *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir.2002).[2]

■■ Even if a government deprivation of life, liberty, or property comports with substantive due process, procedural due process requires that such deprivation be implemented in a fair manner. *See Prater v. City of Burnside, Kentucky*, 289

F.3d 417, 431 (6th Cir.); *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir.1999). Procedural due process requires notice and a hearing before being deprived of a protected interest. *See Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

■ To establish either a substantive or procedural due process violation, plaintiff must first demonstrate the existence of a constitutionally-protected property or liberty interest. *See Prater v. City of Burnside, Kentucky*, 289 F.3d 417, 431 (6th Cir.); *see also Glucksberg*, 521 U.S. at 720–22, 117 S.Ct. 2258; *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir.1992). Here, plaintiff has alleged the existence of a protected property interest in a special use permit for the construction of a radio tower on his property.

■ Where, as here, the deprivation of a constitutionally-protected property interest is alleged, a plaintiff must show either a "legitimate claim of entitlement to" or a "justifiable expectation of" a benefit, not merely "an abstract need or desire for it." *See Roth*, 408 U.S. at 577., 92 S.Ct. 2701 A showing of entitlement or justification cannot be made, however, when a local government has discretion to deny a permit. *See Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) ("We have previously recognized that a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary.").

In this case, Algoma Township Ordinances provide that a non-commercial, ground-mounted tower "shall not exceed a

---

**2.** Such fundamental rights include those listed in the Bill of Rights as well as the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. *See Glucksberg*, 521 U.S. at 720.

height of 50 feet," except as permitted by the Planning Commission as a special use. *See* Algoma Township Ordinances §§ 4.30, 4.31. The Commission *may* grant a special use permit for a higher tower, however, if an applicant meets certain requirements. *See* Algoma Township Ordinances § 16.10 (emphasis added). The absence of any mandatory language and the inclusion of the word "may" gives the Planning Commission broad discretion to grant special use permits for higher towers, even to those property owners who have met all the requirements. *See Silver*, 966 F.2d at 1036.

■ Given this discretion, plaintiff cannot show either a "legitimate claim of entitlement" or a "justifiable expectation" to a special use permit from defendants. Absent this showing, plaintiff cannot demonstrate the existence of a constitutionally-protected property interest, which is a necessary predicate to both his substantive and procedural due process claims. Even if plaintiff had identified a constitutionally-protected property interest, however, he has cited no authority for the proposition that the right to a special use permit is "implicit in the concept of ordered liberty" such that it would fall under the protections of substantive due process.

■ Plaintiff further argues, however, that a protected property interest to the special use permit springs from a FCC declaratory ruling known as PRB–1. *See Federal Preemption of State and Local Regulations Pertaining to Amateur Radio Facilities*, 101 F.C.C.2d 952, 50 Fed.Reg. 38,813 (1985)("PRB–1"). PRB–1 sets up a policy of limited federal preemption of "[s]tate and local regulations that operate to preclude amateur communications in their communities." *See id.* ¶ 24.

■ The Supreme Court has long recognized that section 1983 may be used to enforce not only rights secured by the Constitution, but also those secured by federal statutes. *See Maine v. Thiboutot*, 448 U.S. 1, 6–8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Such recognition has been extended to federal regulations, which have the force of law and can create rights enforceable through section 1983. *See Wright v. Roanoke Redevelopment and Hous. Auth.*, 479 U.S. 418, 431, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); *Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir.1994). This extension to federal statutes and regulations is not without limit, however, as they will not give rise to a federal right if 1) "the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983," or 2) "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wright*, 479 U.S. at 423, 107 S.Ct. 766.

The Supreme Court has historically applied a three part test to determine whether a federal statute creates federal rights:

> First, Congress must have intended that the provision in question benefit the plaintiff.... Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence.... Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Applying this test, the Sixth Circuit has determined that PRB–1 does not create a federal right enforceable through Section 1983. *See Baskin v. Bath Twp. Bd. of Zoning Appeals*, 101 F.3d 702 (6th Cir.1996)(unpublished); *see also Howard*

*v. City of Burlingame,* 937 F.2d 1376 (9th Cir.1991)(holding that PRB–1 does not create a right enforceable under section 1983). The *Baskin* Court concluded that "PRB–1 was intended to benefit federal interests ... [and] cannot provide the basis for plaintiff's substantive due process claim." *Id.*

Plaintiff Bosscher argues that *Baskin* was wrongly decided, and urges this Court to disregard its holding. That issue need not be reached, however, as the Supreme Court has recently clarified the requirements for finding a right enforceable under section 1983. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). In light of *Gonzaga,* this Court must look anew at PRB–1 to determine whether Congress intended to create a right enforceable under section 1983.

In *Gonzaga,* the Supreme Court considered whether the Family Educational Rights and Privacy Act (FERPA) creates a federal right enforceable under section 1983. In determining that it does not, the Court tightened the requirements for finding such a right. Though not explicitly rejecting the three-factor *Blessing* test, the Court did "reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action under s 1983." *Id.* at 2275. The Court noted specifically that "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.*

The *Gonzaga* Court further clarified that in section 1983 cases, just as in implied rights of action cases, the initial inquiry is "whether Congress intended to confer individual rights upon a class of beneficiaries." *Id.* at 2276. Such intent will be clear from statutory text "phrased in terms of the persons benefited" and containing "explicit rights-creating terms."

*Id.* at 2275–76. The Court concluded that "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under 1983 or under an implied right of action." *Id.* at 2277.

In PRB–1, the FCC addressed "the clear dichotomy of viewpoint" between local governments and individual amateur radio operators over tower height ordinances. *See* PRB–1 ¶ 22. In so doing, the FCC found that the "strong federal interest in promoting amateur communications" warranted a limited federal preemption policy: "State and local regulations that operate to preclude amateur communications in their communities are in direct conflict with federal objectives and must be preempted." *Id.* ¶ 24.

In striking this balance between federal and local interests, the FCC did note that "[s]ome amateur antenna configurations require more substantial installations than others if they are to provide the amateur operator with the communications s/he desires to engage in." *Id.* ¶ 25. PRB–1 stops short of imposing a tower height below which local governments may not regulate, however, requiring only that such regulations "be crafted to accommodate reasonably amateur communications, and to represent the minimum practicable regulations necessary to accomplish the local authority's legitimate purpose." *Id.*

Considering the text of PRB–1 as a whole, it certainly does not "unambiguously," with "explicit rights-creating terms," indicate Congress' intent to confer individual rights on amateur radio operators. *See Gonzaga,* 122 S.Ct. at 2275. Indeed, while amateur radio operators certainly constitute a class who might benefit from the limited federal preemption established under PRB–1, "[t]he question is not simply who would benefit from the [provision], but

whether Congress intended to confer federal rights upon those beneficiaries." *Id.* at 690–93.

No such Congressional intent is evident in PRB–1, which explicitly focuses on "the *federal* interest in promoting amateur operations." PRB–1 ¶ 22 (emphasis added); *see also Baskin,* 101 F.3d 702 ("PRB–1 was intended to benefit federal interests."); *Howard,* 937 F.2d at 1380 ("[T]he language of PRB–1 itself confers only a limited federal preemption, and promotes the federal interest in amateur radio operations rather than any individual operator's right to erect the antenna of his or her choice."). PRB–1 contains no "unmistakeable focus on the benefited class" as under Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, both of which provide that "no person shall ... be subjected to discrimination." *See id.* at 2275, n. 3., *citing Cannon v. University of Chicago,* 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Neither does the structure of PRB–1 support plaintiff's argument that it creates rights enforceable under section 1983. The regulation does not create any rights in amateur radio operators. Rather, it commands local governments to "accommodate reasonably" amateur communications. This "focus on the person regulated rather than the individuals protected create[s] 'no implication of an intent to confer rights on a particular class of persons.'" *Gonzaga,* 122 S.Ct. at 2277, *quoting Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

In conclusion, neither the text nor the structure of PRB–1 support plaintiff's argument that Congress intended to create individual rights in amateur radio operators. *See Gonzaga,* 122 S.Ct. at 2276. Furthermore, as discussed above, plaintiff fails to allege a constitutionally-protected property interest necessary to sustain both of his due process claims. Even if he had, however, plaintiff has made no showing that the right to a special use permit is "implicit in the concept of ordered liberty." Given this, plaintiff fails to state either substantive or procedural due process claims under § 1983 and counts II and III of his complaint are dismissed.

## B. First Amendment

 Plaintiff further contends that defendants' denial of his application for a special use permit violates his rights of speech and association under the First Amendment. At its core, plaintiff's argument is that absent a tower of sufficient height he is prevented from communicating or associating with amateur radio operators living south of the ridge on his property.

 To begin, it is clear that the freedoms of speech and association are protected under the First Amendment to the Constitution. *See* Amendment I; *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (it is "implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.").

 These rights are not without limit, however, and may be restricted by content-neutral time, place, and manner zoning ordinances. *See City of Los Angeles v. Taxpayers,* 466 U.S. 789, 808, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Grider v. Abramson,* 180 F.3d 739, 748 (6th Cir. 1999). In the context of tower height ordinances, courts have uniformly held that no First Amendment claim arises from the denial of a special use permit that is not "based on the content of [the] proposed

speech, but [is] an attempt to promote legitimate content-neutral interests." *Williams v. City of Columbia,* 906 F.2d 994, 999 (4th Cir.1990); *see also Howard v. City of Burlingame,* 937 F.2d 1376, 1381 (9th Cir.1991); *Guschke v. City of Oklahoma City,* 763 F.2d 379, 385 (10th Cir. 1985).

In this case, plaintiff alleges only that he possesses speech and associational rights and that the Planning Commission's denial of his application for a special use permit violated them. Plaintiff fails to allege that the denial was not based on the desire to promote legitimate, content-neutral interests. Even if plaintiff had made such allegations, however, it is clear from even a cursory reading of the conclusions of the Commission that its denial of plaintiff's application was based not on the content of his proposed speech, but rather on the lack of evidence of his need for a high tower, concerns over the tower's incompatibility with the surrounding area, and its negative impact on rural views. *See July 18, 2000, Findings of Fact* ¶ 1. Such aesthetic concerns are legitimate content-neutral interests. *See City of Los Angeles,* 466 U.S. at 805, 104 S.Ct. 2118.

In sum, even reading plaintiff's complaint in the most favorable light, there is nothing to support the notion that defendants' denial of his application was neither content-neutral nor based on a desire to promote legitimate governmental interests. Accordingly, count IV for relief under the First Amendment must be dismissed.

*C. Preemption Under PRB-1*

■ Finally, plaintiff argues that defendants' actions are preempted by the Federal Communications Commission declaratory ruling known as PRB-1. PRB-1 establishes a policy of limited federal preemption of local regulations that "operate to *preclude* amateur radio communications

in their communities" by restricting radio tower placement, screening, or height. PRB-1 ¶ 24 (emphasis added). PRB-1 mandates that local regulations "accommodate reasonably amateur communications, and [ ] represent the minimum practicable regulation to accomplish the local authority's legitimate purpose." PRB-1 ¶ 25.

Plaintiff's motion for summary judgment does not pose a facial challenge to the Algoma Township ordinances, but rather argues that, as applied, these ordinances failed to "accommodate reasonably amateur communications" because the defendants' actions prevent him from using his handheld transceiver to communicate via simplex with amateur operators located south of the ridge on his property. This argument must be rejected, as both the text of PRB-1 and the cases applying it have roundly dismissed the notion that an amateur radio operator is entitled to a tower sufficient to enable him to engage in the any type of communication *he wishes to engage in. See Pentel v. City of Mendota Heights,* 13 F.3d 1261, 1264 (8th Cir. 1994) ("Application of this reasonable accommodation standard ... does not require the city to allow the amateur to erect any antenna she desire[s]."); *Williams v. City of Columbia,* 906 F.2d 994, 998 (4th Cir.1990) ("[A]bsent a full federal preemption in this area, the law cannot be that municipalities have no power to restrict antennas to heights below that desired by the radio licensee.")

■ Given that plaintiff is not entitled to any tower he desires, the proper inquiry of this Court is whether the Algoma Township Planning Commission, in the application of its ordinances, provided for the reasonable accommodation of amateur radio communications. *See Evans v. Board of County Comm'rs,* 994 F.2d 755 (10th Cir.1993); *MacMillan v. City of Rocky*

*River,* 748 F.Supp. 1241, 1248 (N.D.Ohio 1990).

In this case, a review of the extensive record indicates that the Planning Commission did "accommodate reasonably" amateur radio communications. Indeed, the record is devoid of any evidence that the Commission's denial of the special use permit will prevent plaintiff from communicating with other amateur operators.

To begin, it is clear that the Commission had a firm understanding of the requirements of PRB–1 and recognized its obligation to "accommodate reasonably" plaintiff's request. *See MacMillan v. City of Rocky River,* 748 F.Supp. 1241 (N.D.Ohio 1990) (preempting under PRB–1 where the City did not sufficiently consider, or even adequately understand, the federal regulation). Defendant Clary, at the January 18, 2000, meeting where plaintiff's application was first addressed, specifically noted that the Commission was not under any obligation to approve the request, but only to make a reasonable effort to accommodate it. *See* January 18, 2000, Minutes at 5. The Township attorney reiterated this point at the March 21, 2000, meeting. *See* March 21, 2000, minutes at 18.

In addition, the Planning Commission attempted to compromise with plaintiff, considering several alternatives to his special use application. At least two Commission members discussed with plaintiff the option of using a crank-up tower rather than a fixed, 180 foot tall tower. *See* January 18, 2000, minutes at 5; March 21, 2000, minutes at 16. While the viability of a crank-up tower at plaintiff's location is debatable, its consideration is evidence of reasonable accommodation on the part of defendants'. *See Evans,* 994 F.2d at 762.

The Commission also recognized that other locations might be more suitable for a tower suiting plaintiff's needs. Relying on the Radio North report, the Commission specifically found that it could reasonably accommodate plaintiff's amateur communications desires in several ways. First, the Commission noted that "there are several existing tower sites in the local area that would be suitable for housing a Ham repeater system." *See* Findings of Fact ¶ 2. Second, plaintiff could enjoy "[v]ery suitable coverage" from his property by using a 60 foot tall tower in conjunction with this repeater system. *See id.* Third, the Commission found that there are sufficient existing structures in the area that could house a repeater system. *See id.* Finally, the Planning Commission found that it "could favorably consider" a special use request from plaintiff for such a 60 foot tall tower. *See id.*

Furthermore, the Commission's focus on the use of repeaters to meet plaintiff's goals was certainly a reasonable accommodation given that communication through repeaters is actually the norm and would enable plaintiff to reach amateur operators located south of the ridge on his property. *See* Drew Wireless Report at 1. Indeed, uncontroverted evidence indicates that plaintiff's steadfast desire to communicate with a mobile from his location via simplex is "pie in the sky" and "impractical." *See* Drew Wireless Report at 2. Another consultant, Dean Alger, testified that plaintiff's desire to communicate simplex was "unreasonable" given the topography of his land. *See* Alger Dep. at 61–62. Indeed, while there is evidence that plaintiff *may* be able to communicate simplex over the ridge with a 185 foot tower, at least one expert is not certain he could do so even with a 195 foot tower. *See id.* at 82.

If plaintiff were to use a more powerful transceiver, such as a 25 watt fixed base, he might be able to communicate simplex over the ridge with a tower as low as 20 feet. *See* Felde Dep. at 60. In fact, simplex using a portable radio is

uncommon. *See* May 10, 2001, Alger Communications Report at 2. Indeed, uncontroverted evidence indicates that repeaters are "the normal means of communication," for amateur operators, particularly those using mobile transceivers and in disadvantageous locations. *See* Drew Wireless Report at 1; May 10, 2001, Alger Communications Report at 2–3. Most amateur radio operators actually prefer to use repeaters rather than simplex because it is easier, especially for those with portables. *See* Felde Dep. at 79–82. Indeed, Alger testified that by using his existing equipment, plaintiff could reach at least three repeaters from his property with a 60 foot tower. *See* Alger Dep. at 35. From those repeaters he could communicate with individuals south of the ridge. *Id.* at 36–37.

In sum, the record reveals that the Algoma Township Planning Commission "accommodated reasonably" plaintiff's amateur radio desires by carefully considering the relevant law, offering compromise solutions, ordering an independent assessment of the application, and making detailed findings of its reasons for denying the application. Furthermore, the record reveals that communication via repeater is reasonable and is a valid option for plaintiff. Accordingly, no material issue of fact remains and, as a matter of law, PRB–1 does not preempt defendants' actions. Defendants' motion for summary judgment is therefore granted.

## IV. Conclusion

For the reasons set forth above, defendants' motions to dismiss and for summary judgment are granted and plaintiff's motion for summary judgment is denied. The Court will enter an order consistent with this opinion.

### ORDER

In accordance with the Court's opinion of even date,

**IT IS ORDERED** that defendants' motion to dismiss Counts II, III, and IV of the complaint is **GRANTED**; and

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment on Count I of the complaint is **GRANTED**; and

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment on Count I of the complaint is **DENIED AS MOOT.**