Dellita **JOHNSON**, Plaintiff,

v.

**CITY OF DETROIT and City of Detroit Housing Commission,** Defendants.

No. 03–CV–74440–DT.

United States District Court, E.D. Michigan, Southern Division.

May 24, 2004.

Lawrence J. Buckfire, Southfield, MI, for Plaintiffs.

James D. Noseda, Jane K. Mills, City of Detroit Law Department, Detroit, MI, for Defendants.

**ORDER GRANTING IN PART DEFENDANTS' "MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED" AND DISMISSING SUPPLEMENTAL STATE LAW CLAIMS PURSUANT TO 28 U.S.C. § 1367**

CLELAND, District Judge.

Pending before the court is Defendants' March 5, 2004 motion to dismiss for failure to state a claim. Plaintiff filed a response to the motion on March 25, 2004, and Defendants filed their reply brief on April 8, 2004. The court conducted a hearing on Defendants' motion on May 20, 2004. For the reasons set forth below, the court will grant Defendants' motion with regard to Counts I, II, and III and dismiss the re-maining state law claims pursuant to 28 U.S.C. § 1367.

## I. BACKGROUND

This case was filed by Dellita Johnson on behalf of seventeen-year-old minor Plaintiff Jerome Johnson for injuries allegedly caused from lead-based paint poisoning that he suffered at the age of two.[1] Jerome Johnson ("Plaintiff") and his mother Dellita Johnson resided at the Jeffries Homes, a public housing project in Detroit, Michigan from 1988 until 1992. The public housing project was owned and managed by the City of Detroit Housing Commission and the City of Detroit during the relevant time frame.[2] The Detroit Housing Commission ("DHC") is a department of the city created in 1933 by city ordinance under Michigan's Housing Facilities Act, Michigan Compiled Laws § 125.651, et seq. The ordinance is presently codified at 1984 Detroit City Code §§ 14–5–1 to 14–5–22. The City and the DHC received federal funding from the Secretary of Housing and Urban Development ("HUD") for the operation and management of the Jeffries Homes facility pursuant to Section 8 of the United States Housing Act, 42 U.S.C. § 1437f.

Section 8 provides that the Secretary of HUD may enter annual contributions contracts with public housing agencies like the DHC, which permit the public housing agencies to obtain federal funding to enable low-income families to enter the housing market. 42 U.S.C. § 1437f. The purpose of Section 8 is "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for fami-

---

1. Plaintiff is now seventeen years old and claims to have been diagnosed with lead poisoning at the age of two. (Pl.'s Resp. at x.)

2. The Jeffries Homes project was "public housing" owned by the City, a "public housing authority" ("PHA"). *See* 42 U.S.C. § 1437a(6)(B) (defining a PHA).

lies of lower income." 42 U.S.C. § 1437. Under the program, qualified tenants pay a portion of their income to landlords and the public housing authorities make additional assistance payments to the landlords with federal funds that are received from HUD. *See* 42 U.S.C. § 1437a(a), 1437f(b), (c) & (o).

Plaintiff alleges that, while residing at the Jeffries Homes housing project, Dellita Johnson complained to Defendants' agents and employees regarding problems with peeling, chipping, and flaking paint in and around her living unit. Plaintiff claims that Defendants "refused, failed, and otherwise neglected to repaint or repair the problem," and "also failed to perform required lead inspections and risk assessments of [his] unit, failed to properly warn [him] of the potential lead-based paint hazards, and failed to provide a proper grievance process for these defects." (Pl.'s Resp. at x.)

In his August 27, 2003 seven-count complaint, Plaintiff names the City of Detroit and the DHC as Defendants. Count I alleges a cause of action for damages under 42 U.S.C. § 1983 for the deprivation of federal rights created under provisions of the United States Housing Act, 42 U.S.C. § 1437, *et seq.* ("USHA"), the Lead–Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4801, 4821, and 4822 ("LBPPPA"), and administrative regulations created under those statutes. Count II alleges "other violations of federal law;" however, it is also based on federal rights under the same statutes and regulations as described in Count I, namely 42 U.S.C. § 1437, *et seq.*, 42 U.S.C. § 4821 et seq., and administrative regulations passed pursuant to those statutes. Count III alleges a violation of an implied private right of action under the LBPPPA itself. Count IV asserts a claim for breach of the annual contributions contract (the "ACC") executed between HUD and the DHC, as a third-

party beneficiary. Count V alleges a violation of Michigan Compiled Laws § 554.139 (breach of the warranty of habitability). Count VI asserts a common law negligence claim, and Count VII alleges nuisance per se.

## II. STANDARD

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir.1996); *Cline v. Rogers,* 87 F.3d 176, 179 (6th Cir.1996); *Wright v. MetroHealth Med. Ctr.,* 58 F.3d 1130, 1138 (6th Cir.1995). When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Columbia Natural Res., Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995); *In re De-Lorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993); *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations. *Wright,* 58 F.3d at 1138; *Columbia Natural Resources, Inc.,* 58 F.3d at 1109.

Though decidedly liberal, this standard of review does require more than the bare assertion of legal conclusions. *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 726 (6th Cir.1996); *LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1100–01 (6th Cir.1995). The complaint should give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994). "In practice, 'a ... complaint must contain either direct or inferential allegations re-

specting all the material elements to sustain a recovery under *some* viable legal theory.'" *Lillard*, 76 F.3d at 726 (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)). "In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir.2001) (emphasis omitted) (citing *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir.1997)).

## III. DISCUSSION

### A. Plaintiff's § 1983 Claims (Counts I & II)

Plaintiff alleges a cause of action based on 42 U.S.C. § 1983 for violation of various statutory provisions and administrative regulations. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws*, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity,

injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).

Section 1983 does not create substantive rights; it merely serves as a vehicle to enforce deprivations of "rights[,] privileges, or immunities secured by the Constitution and laws [of the United States]." *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (" § 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States"); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) ("One cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything.").

In *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme court interpreted the "and laws" language in the statute and held that § 1983 may be used to enforce violations of certain rights created by federal statutes as well as rights created by the Constitution.[3] The *Maine* Court ignored the scanty legislative history associated with the addition of the "and laws" language, recognizing that § 1983 could be used to enforce federal rights created in favor of individual persons by statute. However, the Supreme Court has emphasized that "in order to seek redress through § 1983, ... a plaintiff must assert the violation of

---

**3.** Initially, § 1983 came onto the books as part of the Ku Klux Klan Act of April 20, 1871, often called that Civil Rights Act of 1871. Act of Apr. 20, 1871, ch. 22, 17 Stat. 13. It is commonly accepted that Congress enacted this legislation to alleviate state-sanctioned discrimination following the adoption of the Civil War amendments. *See Monroe v.*

*Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). As originally passed the Civil Rights Act of 1871 only provided a cause of action for deprivation of constitutional rights. The phrase "and laws" was added in 1874. *See* Rev. Stat.1979 (1874); *Maine*, 448 U.S. at 15–16, 100 S.Ct. 2502 (Powell, J., dissenting) (discussing the legislative history).

a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *See also Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268 (quoting *Blessing*). Despite conflicting opinions from sister circuits, the Sixth Circuit has also permitted federal regulations to create rights enforceable under § 1983 by their own force.[4] *See Levin v. Childers*, 101 F.3d 44, 47 (6th Cir.1996); *Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir.1994). Federal statutes, however, will not give rise to federal rights enforceable by an individual under § 1983 if (1) "the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983," or (2) "Congress has foreclosed such enforcement . . . in the enactment itself." *Wright v. Roanoke Redevelopment and Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987).

In *Blessing v. Freestone*, the Supreme Court identified three "factors" to guide a court's inquiry into whether or not a statute confers an individual federal right: (1) "Congress must have intended that the provision in question benefit the plaintiff;" (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial resources;" and (3) "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353; *Banks v. Dallas Hous. Auth.*, 271 F.3d 605, 609 (5th Cir.2001). Although courts in the Sixth Circuit have historically applied the three factors identified in *Blessing* as a "three-part test,"[5] the Supreme Court recently resolved the confusion that such a test has caused in determining whether Congress unambiguously conferred rights on individuals to support a cause of action under § 1983. *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268.

In *Gonzaga*, the Court considered whether the Family Educational Rights and Privacy Act ("FERPA") creates a federal right enforceable by individuals under 42 U.S.C. § 1983. In examining the text

---

4. As discussed in more detail below, the Sixth Circuit's rule which holds that regulations alone can create enforceable federal rights under § 1983 may no longer be viable in light of recent Supreme Court decisions. *See Gonzaga*, 536 U.S. at 285–286, 122 S.Ct. 2268; *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *Save Our Valley v. Sound Transit*, 335 F.3d 932, 939 (9th Cir.2003); *South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 274 F.3d 771 (3d Cir.2001); *Harris v. James*, 127 F.3d 993 (11th Cir.1997); *Smith v. Kirk*, 821 F.2d 980 (4th Cir.1987). However, the Sixth Circuit's decisions in *Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir.1994) and *Levin v. Childers*, 101 F.3d 44, 47 (6th Cir.1996) remain binding precedent on this court because the U.S. Supreme Court has not directly considered whether regulations alone may ever create federal rights enforceable under § 1983. *See Timmreck v. United States*, 577 F.2d 372, 374 n. 6 (6th Cir.1978) ("The district courts in this circuit are, of course, bound by pertinent decisions of this Court even if they find what they consider more persuasive authority in other circuits.")

5. Compare *Westside Mothers v. Haveman*, 289 F.3d 852 (6th Cir.2002) (applying the *Blessing* factors as a three-part "test"); *Wood v. Tompkins*, 33 F.3d 600, 607 (6th Cir.1994) (applying "the Three Part 'Enforceable Rights' Test"), with *Hughlett v. Romer–Sensky*, No. 02–3886, 2004 WL 435890, *3 & n. 3 (6th Cir. Mar.4, 2004) (applying the "factors" in *Blessing* and noting that the Supreme Court has clarified the application of the first "benefit" factor and made clear that the court's focus should be on "whether the statutory provision contained . . . 'rights creating' language critical to showing the requisite congressional intent to create new rights.") In *Gonzaga*, the Supreme Court did not expressly reject the three factors from *Blessing*, but did "reject the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action under § 1983." *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268.

and structure of the statutory language relied on by the plaintiff, the court held that FERPA's nondisclosure provisions did not create federal rights actionable under § 1983. *Id.* at 290, 122 S.Ct. 2268. In finding that Congress did not create federal rights, the Court determined that FERPA's nondisclosure provisions "contain no rights-creating language," "have an aggregate, not individual focus," and "serve primarily to direct the Secretary of Education's distribution of public funds." *Id.*

The *Gonzaga* Court tightened and clarified the requirements that must be met before declaring that Congress intended to create a federal right enforceable under § 1983 in two fundamental aspects. First, the Supreme Court clarified the conflict between the Court's implied right of action cases and its cases focusing on enforceable federal rights under § 1983. The Court rejected "the notion that our implied right of action cases are separate and distinct from our § 1983 cases." "To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Id.* at 283, 122 S.Ct. 2268. The court further explained,

> We have recognized that whether a statutory violation may be enforced through § 1983 "is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute." *Wilder, supra,* at 508, n. 9, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455. But the inquiries overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right.* Thus we have held that "[t]he question whether Congress ... intended to create a private right of action [is] definitively answered in the negative" where a "statute by its terms grants no private rights to any identifiable class." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576, 99 S.Ct.

2479, 61 L.Ed.2d 82 (1979). For a statute to create such private rights, its text must be "phrased in terms of the persons benefitted." *Cannon v. University of Chicago,* 441 U.S. 677, 692, n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). We have recognized, for example, that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes are phrased "with an *unmistakable focus* on the benefitted class." *Id.,* at 691, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (emphasis added). But even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent "to create not just a private *right* but also a private *remedy.*" *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

*Id.* at 283–84, 122 S.Ct. 2268 (emphases added). The Court has made it clear that "[a] court's role in discerning whether personal rights exist in the § 1983 context should ... not differ from its role in discerning whether personal rights exist in the implied right of action context." *Id.* at 285, 122 S.Ct. 2268.

Second, the Court clarified the judicial role and the proper inquiry for courts in determining whether statutes create enforceable rights under § 1983. The Court reviewed its prior cases involving federal spending clause legislation and determined that a court's fundamental role is to determine whether Congress has created new federal rights unambiguously based on the text and structure of a statute. *Id.* at 283–91, 122 S.Ct. 2268. The first step the court must take is determining "whether Congress *intended to create a federal right.*" *Id.* at 283, 122 S.Ct. 2268; *see also Sabree v. Richman,* 367 F.3d 180, 2004 WL 1048325, *2 (3d Cir. May 11, 2004);

*Long Term Care Pharmacy Alliance,* 362 F.3d at 57–58; *Schmitt v. City of Detroit,* 267 F.Supp.2d 718, 721 (E.D.Mich.2003). Such an intent will be clear from statutory text "phrased in terms of the persons benefitted," which employs "explicit rights-creating language." *Gonzaga,* 536 U.S. at 284, 122 S.Ct. 2268. The Court concluded "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under a § 1983 *or* an implied right of action." *Id.* at 284, 122 S.Ct. 2268 (emphasis added); *Alexander v. Sandoval,* 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intention to confer rights on a particular class of persons.'"). Furthermore, the Court rejected the argument that federal rights were created by federal statutes so long as Congress "intended that the statute 'benefit' putative plaintiffs." *Id.* at 282, 121 S.Ct. 1511. "The question is not simply who would benefit from the [statute], but whether Congress intended to confer *rights* upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). As the *Gonzaga* Court stated, "it is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983]." *Gonzaga,* 536 U.S. at 283, 122 S.Ct. 2268; *see also Hughlett,* 2004 WL 435890 at n. 3 (rights-creating language is critical to Congressional intent to create new federal rights).

### 1. The USHA Provisions Cited Do Not Create Rights Enforceable Under § 1983

Plaintiff asserts that Defendants had a duty under the USHA, "42 U.S.C. Section 1437, *et seq.* including sec. 1437f regarding the Section 8 Program," to ensure that Plaintiff's housing was "safe, decent, and sanitary." (Pl.'s Compl. at ¶ 13.) Plain-tiff's complaint does not specifically identify which sections of "42 U.S.C. § 1437 *et seq.*" create federal rights. The complaint generally refers to 42 U.S.C. §§ 1437 and 1437f. As such, the court turns to the statutory text and structure of these provisions to determine whether Congress intended to create new federal rights under the provisions cited by Plaintiff.

■ As an initial matter, § 1437 comprises a Congressional policy declaration which does not confer enforceable rights. 42 U.S.C. § 1437(a) ("Declaration of policy. It is the policy of the United States— ..."). The language of § 1437 does not include rights-creating language; instead it contains broad policy statements regarding the federal government's goals in promoting "decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and Local governments ...." *Id.* at § 1437(a)(4). Other courts have also concluded that the USHA's policy statement reflected in § 1437 does not create new federal rights enforceable under § 1983. *See Perry v. Hous. Auth. of the City of Charleston,* 664 F.2d 1210, 1213 (4th Cir.1981); *Howard v. Pierce,* 738 F.2d 722, 727 n. 9 (6th Cir. 1984) (agreeing with *Perry* in that the Act's policy declaration (§ 1437) does not provide a private cause of action).

Next, 42 U.S.C. § 1437f (Section 8) authorizes the Secretary of HUD to enter into "annual contributions contracts" ("ACCs") with public housing agencies like the DHC. Under these ACCs, the public housing agencies may enter into contracts to make assistance payments to owners of existing dwelling units under Section 8 (for low-income housing assistance). 42 U.S.C. § 1437f(b). Defendants acknowledge that the Jeffries property was public housing owned by a public housing agency (the City of Detroit) subject to Section 8. Under 42 U.S.C. § 1437d(f)(1), a provision not

cited in Plaintiff's complaint, "each [annual contributions contract] for a public housing agency shall require that the agency maintain its public housing in a condition that complies with the standards which meet or exceed the housing quality standards ["HQS"] under paragraph (2)." Paragraph (2) states that the "Secretary shall establish housing quality standards ... that ensure that public housing dwelling units are safe and habitable." *Id.* at 1437d(f)(2). The HQS under this section "shall, to the greatest extent practicable, be consistent with the standards established under section 1437f(*o*)(8)(B)(i)." *Id.*

■ Nothing in these provisions establishes a clear and unambiguous intent by Congress to create privately enforceable rights under § 1983 to ensure compliance with housing quality standards. The statutory provisions cited by Plaintiff focus on the Secretary of HUD's responsibilities and govern when assistance payments may be made to a public housing agency such as the DHC. The statute confers the authority on HUD to issue housing quality standards for public housing agencies to follow, but it does not contain language which unambiguously creates rights in Section 8 tenants.

Plaintiff essentially argues that the statutory language creates a federal right for Section 8 tenants in "safe and habitable" housing as reflected in the housing quality standards implemented for public housing agencies to follow. The residents of public housing undoubtedly benefit from the statutory provisions which condition the receipt of federal funds on the requirements to follow the housing quality standards. However, the statute focuses on regulating the Secretary and the public housing agencies through the Secretary's promulgation of housing quality standards. In other words, public housing authorities could make assistance payments only to the property owners who maintained housing units in accordance with the housing quality standards for decent and safe housing. This focus on the entity being regulated cuts against any intent to create rights enforceable by individual tenants. *See Banks,* 271 F.3d at 609–10 (tenants of Section 8 housing could not assert cause of action under § 1983 to enforce 42 U.S.C. § 1437(e) because providing decent and safe housing was a condition of federal funds and did not confer enforceable rights).

■ As the Supreme Court has made clear, statutory language that merely benefits putative plaintiffs without specific rights-creating language is insufficient to confer a new federal right enforceable under § 1983. *Gonzaga,* 536 U.S. at 283, 122 S.Ct. 2268. In addition, the Court has observed that "statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intention to confer rights on a particular class of persons.'" *Sandoval,* 532 U.S. at 275, 121 S.Ct. 1511; *See also Cannon v. Univ. of Chicago,* 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (recognizing that Title VI of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972 created individual federal rights because those statutes were phrased "with an unmistakable focus on the benefitted class"). *Gonzaga* highlighted the type of rights-creating language that confers a federal right on individuals by citing to the statutory language contained in Title VI of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972. *Gonzaga,* 536 U.S. at 283–84, 122 S.Ct. 2268. Title VI confers individual federal rights. It provides, in relevant part: "No *person* in the United States *shall ... be subjected to* discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphases added). Like-

wise, Title IX's language created individual rights. It provides: *"No person* in the United States *shall,* on the basis of sex ... *be subjected to* discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphases added). Congress need not invoke magic words to create individual rights; however the USHA provisions at issue do not focus on the individual tenant or contain sufficient rights creating language.

This court recognizes that the statutory language in the Brooke Amendment, a separate provision of the USHA, has been held to create enforceable rights for families. *Wright,* 479 U.S. at 418, 107 S.Ct. 766; *see also Howard,* 738 F.2d at 730 (finding an implied cause of action for tenants to seek injunctive and declarative relief against HUD to enforce the Brooke Amendment, but declining to extend such an action to a public housing agency (the Grand Rapids Housing Commission)). However, the rent-ceiling provision contained in the statutory language of the Brooke Amendment unambiguously conferred "a mandatory [benefit] focusing on the individual family and its income." *Gonzaga,* 536 U.S. at 280, 122 S.Ct. 2268 (quoting *Wright,* 479 US. at 430, 107 S.Ct. 766). The statutory language in the Brooke Amendment, unlike the current USHA provisions cited by Plaintiff, confers specific monetary entitlements on individual families. *Id.; Howard,* 738 F.2d at 725 (citing the statutory language "A family shall pay as rent for a dwelling unit assisted under this chapter the highest of the following amounts, rounded to the nearest dollar: ....."). The provisions of the USHA triggered in the instant case contain no similar express language conferring a specific entitlement on Plaintiff as a tenant.

## 2. The LBPPPA Does Not Create Federal Rights Enforceable Under § 1983

Next, Plaintiff asserts that Defendants had a duty to comply with the LBPPPA and to ensure that the Jeffries Property complied with the statutory and regulatory requirements under the Act. Plaintiff claims that the LBPPPA creates federal rights in tenants of Section 8 housing that may be enforced pursuant to § 1983. Whether the LBPPPA creates enforceable rights in tenants of Section 8 housing appears to be an issue of first impression in the Sixth Circuit.

The court begins with the text of the statute at issue. The statutory provisions of the LBPPPA cited in Plaintiff's complaint are 42 U.S.C. §§ 4801, 4821, and 4822. Section 4801 was repealed in 1978. *See* Pub.L. No. 95–626, Title II, § 208(b), Nov. 10, 1978, 92 Stat. 3588. Section 4821 provides:

(a) The Secretary of Housing and Urban Development, in consultation with the Secretary of Health and Human Services, shall develop and carry out a demonstration and research program to determine the nature and extent of the problem of lead based paint poisoning in the United States, particularly in urban areas, including the methods by which the lead based paint hazard can most effectively be removed from interior surfaces, porches, and exterior surfaces of residential housing to which children may be exposed.

(b) The Chairman of the Consumer Product Safety Commission shall conduct appropriate research on multiple layers of dried paint film, containing the various lead compounds commonly used, in order to ascertain the safe level of lead in residential paint products. No later than December 31, 1974, the Chairman shall submit to Congress a full and

complete report of his findings and recommendations as developed pursuant to such programs, together with a statement of any legislation which should be enacted or any changes in existing law which should be made in order to carry out such recommendations.

42 U.S.C. § 4821.

Section 4822 describes the general requirements for the Secretary's procedures mandated by the Act. It provides in relevant part:

(a) General requirements

(1) Elimination of hazards

The Secretary of Housing and Urban Development (hereafter in this section referred to as the "Secretary") shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary or otherwise receives more than $5,000 in project-based assistance under a Federal housing program. Beginning on January 1, 1995, such procedures shall apply to all such housing that constitutes target housing, as defined in section 4851b of this title, and shall provide for appropriate measures to conduct risk assessments, inspections, interim controls, and abatement of lead-based paint hazards. At a minimum, such procedures shall require—

(A) the provision of lead hazard information pamphlets, developed pursuant to section 2686 of Title 15, to purchasers and tenants;

(B) periodic risk assessments and interim controls in accordance with a schedule determined by the Secretary, the initial risk assessment of each unit constructed prior to 1960

to be conducted not later than January 1, 1996, and, for units constructed between 1960 and 1978—

(i) not less than 25 percent shall be performed by January 1, 1998;

(ii) not less than 50 percent shall be performed by January 1, 2000; and

(iii) the remainder shall be performed by January 1, 2002;

(C) inspection for the presence of lead-based paint prior to federally-funded renovation or rehabilitation that is likely to disturb painted surfaces;

(D) reduction of lead-based paint hazards in the course of rehabilitation projects receiving less than $25,000 per unit in Federal funds;

(E) abatement of lead-based paint hazards in the course of substantial rehabilitation projects receiving more than $25,000 per unit in Federal funds;

(F) where risk assessment, inspection, or reduction activities have been undertaken, the provision of notice to occupants describing the nature and scope of such activities and the actual risk assessment or inspection reports (including available information on the location of any remaining lead-based paint on a surface-by-surface basis); and

(G) such other measures as the Secretary deems appropriate.

(2) Additional measures

The Secretary may establish such other procedures as may be appropriate to carry out the purposes of this section.

42 U.S.C. § 4822. Section 4822 also requires the Secretary to ensure the inspection of all interior and exterior painted surfaces and abatement of the hazards associated with lead-based paint in target

housing. The statute also describes specific inspection and abatement and reporting requirements for the Secretary. *Id.* at §§ 4822(c) & (d). The statute does not focus on providing individual tenants with specific entitlements to benefits or rights.

▮ Again, the Plaintiff clearly falls within the broader class of beneficiaries who receive protection under the LBPPPA. However, the statutory language does not contain the sort of rights-creating language which reveals Congressional intent to create a federal right for tenants to enforce the procedures mandated by the statute. The statute focuses on the Secretary of HUD, the person being regulated, and not on the tenants as beneficiaries of express rights or entitlements. "[S]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intention to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 275, 121 S.Ct. 1511; *see also Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 57–58 (1st Cir.2004) (finding not rights creating language sufficient to create an enforceable § 1983 right for individuals under Medicaid statutory provision, 42 U.S.C. § 1396(a)(30)(A)). The LBPPPA directs the Secretary to implement "procedures to eliminate as far as practicable the hazards of lead based paint poisoning." 42 U.S.C. § 4822. The statute's language does not unambiguously create new rights enforceable by Section 8 tenants under § 1983. Rather than expressly creating such rights, the LBPPPA grants adminis-trative authority to the executive branch and mandates that the Secretary of HUD include certain requirements relating to the provision of information to purchasers and tenants, periodic risk assessments, inspections, reductions, and abatement of lead-based paint hazards. *Id.* at § 4822(1)(A)-(G). The Act requires HUD to implement certain "procedures" for public housing agencies to follow. This language falls well short of unambiguously conferring individual rights on tenants who would benefit from the Secretary's procedures. *See Roseberry v. United States*, 736 F.Supp. 408, 410 (D.N.H.1990) (holding that the LBPPPA did not create an implied private cause of action and recognizing that "the Act is, in essence, a legislative directive to the Secretary of Housing and Urban Development (HUD) to establish and implement procedures addressing such hazards," and that the LBPPPA "is purely an administrative authority-granting statute").[6]

Further, the administrative regulations in effect during Plaintiff's tenancy were silent regarding whether individuals could privately enforce them. *See Lindsay v. New York City Hous. Auth.*, No. 95–3315(JG), 1999 WL 104599, *4 (E.D.N.Y. Feb.24, 1999) ("The [LBPPPA] regulations, as they appeared in 1992, say nothing regarding whether individuals may privately enforce them.") In addition, the *Lindsay* court noted that the LBPPPA administrative regulations, specifically 24 C.F.R. § 982.406, replacing those in existence in 1992 state that the LBPPPA

---

**6.** During the May 20, 2004, the court asked Plaintiff's counsel to identify the statutory language that provides the type of "rights creating language" which gives rise to Congressional intent to create federal rights in Plaintiff under the LBPPPA. "It is incumbent on the plaintiff ... to identify with particularity the right she claims in order for the court to determine whether a federal statute creates a private right." *Hunter v. Underwood*, 362 F.3d 468, 478 (8th Cir.2004). Counsel's response directed the court's attention to the mandatory and specific requirements placed on the housing commissions. However, the Supreme Court has clearly expressed that statutes focusing on the person regulated rather than the individuals protected does not evidence Congressional intent to create individual rights. *Sandoval*, 532 U.S. at 275, 121 S.Ct. 1511.

"does not create any right of the family, or any party other than HUD or the [PHA], to require enforcement of the [Housing Quality Standards] requirements by HUD or the [PHA], for damages, injunction or other relief, for the alleged failure to enforce the [Housing Quality Standards]." *Id.* Although not dispositive, the 1995 change to the regulations expressly stating that they did not create any rights for families to enforce the Housing Quality Standards buttresses the conclusion that a private enforceable right was not created by the Act. The court does not find an unambiguous Congressional intent to create rights in Section 8 tenants to enforce the procedures mandated by the Secretary of HUD under the LBPPPA.

In addition, Congress has demonstrated its capability of establishing a clear intent to create enforceable rights under a statute similar to the LBPPPA, the Residential Lead–Based Paint Hazard Reduction Act ("LBPHRA") passed as Title X of the Housing and Community Development Act of 1992. *See* Pub.L. No. 102–550, codified at 42 U.S.C. §§ 4851–4856. Under the LBPHRA, which Plaintiff does not assert as a basis for this action, Congress directed the Secretary of HUD and the Administrator of the EPA to promulgate regulations mandating the disclosure of lead-based paint hazards in privately owned housing that is leased or sold. *See* 42 U.S.C. § 4852d; *Sweet v. Sheahan,* 235 F.3d 80, 84 (2d Cir.2000). Much like the LBPPPA, the LBPHRA states that HUD and the EPA shall promulgate regulations for the disclosure of lead-based paint hazards in target housing not later than October 28, 1994. It mandates that the regulations require that the purchaser or lessor shall: (1) provide the purchaser or lessee with certain information regarding the hazards of lead paint; (2) disclose to the purchaser or lessee the presence of any known lead-based paint; and (3) permit the purchaser ten days to conduct a risk

assessment or inspection of the property for lead-based paint hazard. 42 U.S.C. § 4852d(a)(1). The LBPHRA also contains an explicit enforcement provision which states "[a]ny person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." *Id.* at 4852d(b)(3). The final provision of the statute delayed the effective date of regulations under § 4852d until October 28, 1995. This statutory language clearly demonstrates that Congress intended to create federal rights and enforcement of those rights under the LBPHRA. The LBPPPA, in contrast, contains no such express rights or remedy creating language.

Plaintiff argues that *Gonzaga* does not change the court's inquiry and that a statute creates a federal right when it "meets three criteria: (1) intent to benefit the putative plaintiff and (2) mandatory, (3) specific language." (Pl.'s Resp. at 5.) The court disagrees because *Gonzaga* expressly rejected the first part of the inquiry as stated by Plaintiff. "[I]t is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983]." *Gonzaga,* 536 U.S. at 283, 122 S.Ct. 2268. Plaintiff relies on *Wilder v. Virginia Hospital Assn.,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 to support his three criteria approach. However, the *Gonzaga* court explained that its decision in *Wilder* was proper because the statutory provision at issue in that case conferred specific monetary entitlements on the plaintiffs. The *Gonzaga* Court stated:

> In *Wilder v. Virginia Hospital Assn.,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), we allowed a § 1983 suit brought by health care providers to enforce a reimbursement provision of the Medicaid Act, on the ground that the provision, much like the rent-ceiling pro-

vision in *Wright,* explicitly conferred specific monetary entitlements upon the plaintiffs. Congress left no doubt of its intent for private enforcement, we said, because the provision required States to pay an "objective" monetary entitlement to individual health care providers, with no sufficient administrative means of enforcing the requirement against States that failed to comply. 496 U.S., at 522–523, 110 S.Ct. 2510.

*Id.* at 280–81, 122 S.Ct. 2268.[7]

Plaintiff also cites several federal cases that have permitted a plaintiff to use § 1983 to sue for violations of the LBPPPA. Plaintiff cites: *Davis v. Philadelphia Hous. Auth.,* 121 F.3d 92 (3d Cir. 1997); *Aristil v. Housing Auth. of the City of Tampa,* 54 F.Supp.2d 1289 (M.D.Fla. 1999); *Hurt v. Philadelphia Hous. Auth.,* 806 F.Supp. 515, (E.D.Pa.1992); *Paige v. Philadelphia Hous. Auth.,* No. 99–CV–497, 2002 WL 500677,*6–7 (E.D.Pa. Mar.28, 2002); *Elliot v. Chicago Hous. Auth. Inc.,* No. 98 C 6307, 1999 WL 519200 (N.D.Ill. July 14, 1999); and *Hunter v. Norfolk Hous. and Redevelopment Auth.,* No. 95–878 (E.D.Va. Apr. 4, 1996) (Norfolk). These cases, however, do not persuade the court that the text and structure of the LBPPPA reflect an unambiguous Congressional intent to create new rights for tenants to enforce via § 1983.

First, the district court decisions cited by Plaintiff were all decided before *Gonzaga,* and none of them contain a persuasive examination of the language and structure of the LBPPPA itself. The district court cases cited do not provide analysis which identifies the provisions of the statute that unambiguously confer a private right through clear rights-creating language. *See Aristil,* 54 F.Supp.2d at 1293 (focusing on "whether the USHA and the L[B]PPPA are intended to *benefit* Plaintiffs," not on how the text and structure demonstrate Congressional intent to create new rights); *Hurt,* 806 F.Supp. at 524–26; *Paige,* 2002 WL 500677 at *6–7 (applying the *Blessing* three-part test and concluding that LBPPPA was intended to *benefit* plaintiff) (emphasis added); *Elliot,* 1999 WL 519200 at *6 ("Under the *Blessing/Wilder* three-prong test, the court must first assess whether the putative class plaintiffs are intended *beneficiaries* of the LBPPPA.") (emphasis added); *Hunter,* Case No. 95–878 (E.D.Va. Apr. 4, 1996), Order at *7 (focusing on tenants as the *intended beneficiaries* of the LBPPPA and its implementing regulations, but not examining whether the statutory language and structure unambiguously reveal Congressional intent to create new *rights* )

Second, the Third Circuit's decision in *Davis,* although factually similar to the instant case, did not address whether Section 8 tenants have an enforceable right under the LBPPPA for purposes of § 1983. *Davis,* focused specifically on the justiciable issue of standing. In *Davis,* a minor's mother brought an action against a landlord and the City of Philadelphia's Housing Authority, asserting claims based on the LBPPPA. *Davis,* 121 F.3d at 93–94. The Philadelphia Housing Authority

---

7. At the May 20, 2004 hearing, Plaintiff argued that *Gonzaga* should be limited to cases where a federal statutory creates an enforcement mechanism. However, the absence of an enforcement procedure to enforce the requirements of the LBPPPA and its implementing regulations does little to evidence Congressional intent to create rights. Although the court will not engage in the speculative business of attempting to discern Congress's intent from silence, it notes that the absence of a procedural mechanism to enforce the housing commissions' LBPPPA requirements could strengthen the conclusion that conclusion that individually enforceable rights were not intended. The crux of the analysis for this court under *Gonzaga* is to examine the text and structure of the statute to determine if Congress created individual rights enforceable under § 1983.

filed a motion to dismiss the plaintiff's claims (including the § 1983 claim) arguing that the plaintiff lacked prudential standing to assert their claims because their alleged rights fell outside the "zone of interests" intended to be protected by the LBPPPA. *Id.* at 94. The district court granted the motion to dismiss on justiciability grounds, and the Third Circuit reversed, concluding that the asserted rights fell within the Act's "zone of interests." This is obviously a distinct issue from whether the Act's text and structure create new rights. In fact, the Third Circuit stated:

> At the outset, we note the limited scope of the issue we are asked to review; namely, whether the district court erred by dismissing the Davis's claims for lack of standing. This issue is analytically distinct from the related question of whether the Lead Act provides Section 8 participants or their successor tenants with either an express or implied cause of action against the Housing Authority for an alleged breach of its duties to inspect for lead-based hazards and to ensure the removal of such hazards in apartment units which are, or at some time were, part of the Section 8 program.

> .     .     .     .     .

> [W]e need not reach the separate question of whether the Lead Act provides the Davises, as successor tenants, with a cause of action against the Housing Authority for its alleged breach of duties.

*Id.* at 94, 95.

Lastly, the court notes that several of the cases holding that the LBPPPA and the USHA created rights enforceable under § 1983 and predating *Gonzaga* have limited recovery to declarative and injunctive relief. *See Paige*, 2002 WL 500677 at *6–7; *Elliot*, 1999 WL 519200 at *6. In fact, the Sixth Circuit has expressed doubt as to whether rights under the Brooke Amendment of the USHA (a statutory provision which confers specific monetary entitlements on families) would support an implied action for damages. *Howard*, 738 F.2d at 730. After reviewing the statutory text, structure, and cases cited by Plaintiff, the court finds that the LBPPPA does not evince unambiguous Congressional intent to create new federal rights enforceable by Plaintiff under § 1983.

### 3. Whether the Regulations Cited Create Rights Enforceable Under § 1983

Plaintiff also argues that certain regulations issued pursuant to the USHA and the LBPPPA create federal rights enforceable under § 1983. Plaintiff relies on the following sections of the Federal Code of Regulations in effect during the time which Plaintiff lived with his mother in the Jeffries public housing project: 24 C.F.R. §§ 882.109, 882.116, 882.222, 882.209; and 24 C.F.R. § 35 *et seq.*

#### a. Whether Regulations Can Create Federal Rights Under § 1983

Whether federal agency regulations can create enforceable rights of their own accord under § 1983 has been an unsettled and important question. The federal courts of appeals have split in resolving this issue. *Compare Save Our Valley v. Sound Transit*, 335 F.3d 932, 939 (9th Cir.2003) (recent Supreme Court decisions compel the conclusion that "agency regulations cannot independently create rights enforceable through § 1983"); *South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 274 F.3d 771 (3d Cir.2001) (specifically rejecting the approach taken by the Sixth Circuit and holding that "a federal regulation alone may not create a right enforceable through section 1983 not already found in the enforcing statute"); *Harris v. James*, 127 F.3d 993, 1007–09 (11th Cir.1997) (rejecting the approach that would permit a regu-

lation to create a federal right enforceable under § 1983 by its own force and finding that regulations could only flesh out or further define enforceable rights created by statute); *Smith v. Kirk,* 821 F.2d 980, 984 (4th Cir.1987) ("An administrative regulation, however, cannot create an enforceable § 1983 interest not already implicit in the enforcing statute. The Supreme Court has never held that one could—to the contrary, members of the Court have expressed doubt that 'administrative regulations *alone* could create such a right.'") (quoting *Wright,* 479 U.S. at 438, 107 S.Ct. 766 (O'Connor J., dissenting)); *Banks,* 271 F.3d at 610 n. 4 ("[t]he existence of specific HUD regulations should not be relevant to the overriding question whether Congress intended to create a federal right enforceable through § 1983.") *with Loschiavo v. City of Dearborn,* 33 F.3d 548, 551 (6th Cir.1994) (holding that because federal regulations have the force of law, they may create enforceable rights under § 1983); *Levin v. Childers,* 101 F.3d 44, 47 (6th Cir.1996) (same relying on *Loschiavo,* 33 F.3d at 551); *Samuels v. District of Columbia,* 770 F.2d 184, 199 (D.C.Cir.1985) (finding that federal regulations were "laws" that could create rights enforceable under § 1983).

■■■ However, the rule in the Sixth Circuit recognizes that federal regulations alone may create enforceable rights under § 1983. *Loschiavo,* 33 F.3d at 551; *Bosscher,* 246 F.Supp.2d at 797. Although this court finds other decisions from sister circuits more persuasive and questions whether the Sixth Circuit's decisions on this issue remain viable in light of recent Supreme Court precedent, it will continue to apply the Sixth Circuit's approach until it is overruled. "The district courts in this circuit are, of course, bound by pertinent decisions of [the Sixth Circuit] even if they find what they consider more persuasive authority in other circuits." *Timmreck,* 577 F.2d at 374 n. 3 (citing *Doe v. Charleston Area Med. Ctr.,* 529 F.2d 638, 642 (4th Cir.1975)). As the Ninth Circuit has stated; "binding authority is very powerful medicine." *Hart v. Massanari,* 266 F.3d 1155, 1171–73 (9th Cir.2001) (discussing the mandatory nature of circuit court precedent as binding in light of the structure of the federal courts and certain policy judgments about the effective administration of justice). Because the Supreme Court has not directly considered the issue of whether federal regulations alone may create enforceable rights, this court continues to follow the precedent in this Circuit.[8] However, this court will briefly set forth its concerns with the existing precedent in the event that the Sixth Circuit is presented with a case requiring it to reexamine its prior decisions in light of recent Supreme Court decisions.

After examining two recent Supreme Court cases and the persuasive decisions on this issue from other Circuit Courts of Appeals, it appears that a federal regula-

---

8. The Supreme Court has adopted an express rule requiring all lower federal courts to follow its own precedent even it a prior decision is called into question by another line of Supreme Court cases. *Rodriguez de Quijas v. Shearson/American Express Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Agostini v. Felton,* 521 U.S. 203, 207, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). Although this rule does not expressly govern the relationship between the lower federal courts, the structure of the Congressionally created inferior Article III courts counsels this court to find that, in the absence of Supreme Court precedent directly on point, a district court should decline to "underrule" established circuit court precedent.

tion, alone, should not be capable of creating individual rights enforceable under § 1983. *Save Our Valley*, 335 F.3d at 935–36. The Supreme Court's recent § 1983 jurisprudence clarifies its reliance on the principle that *Congress* must create enforceable rights by statute, and valid regulations may merely "define" or "flesh out" the contents of statutory right created by Congress. *See id.; Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268; *Sandoval*, 532 U.S. at 286–87, 291, 121 S.Ct. 1511; *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353; *S. Camden Citizens in Action*, 274 F.3d at 790; *Harris*, 127 F.3d at 1007–08. "So long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute—'in conjunction with the regulation'—may create a federal right." *Harris*, 127 F.3d at 1009.

The Sixth Circuit's rule which permits regulations to create enforceable rights under § 1983 by their own force arose in *Loschiavo v. City of Dearborn*. In that case, the plaintiffs installed a receive-only satellite dish antenna in their backyard. The City of Dearborn ordered the removal of the antenna based on a local zoning ordinance. In response, the plaintiffs filed suit in federal district court, asserting, *inter alia*, a private right of action under § 1983 for violation of rights conferred on them by an FCC regulation, 47 C.F.R. § 25.104. The Sixth Circuit concluded that federal regulations are "laws" under § 1983 because they have the force of law and applied the three factors set forth in *Blessing v. Freestone* to determine whether the plaintiffs had enforceable rights under the administrative regulation. *Loschiavo*, 33 F.3d at 551. In coming to its conclusion the court stated:

> Section 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. In *Maine v. Thiboutot*, 448 U.S. 1, 6–8, 100 S.Ct. 2502, 2505–06, 65 L.Ed.2d 555 (1980), the Supreme Court recognized that plaintiffs may use Section 1983 to enforce not only constitutional rights, but also those rights defined by federal statutes. As federal regulations have the force of law, they likewise may create enforceable rights. *Wright*, 479 U.S. at 431, 107 S.Ct. at 774. Section 1983 is not available, however, "to enforce a violation of a federal statute 'where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.'" *Suter v. Artist M.*, 503 U.S. 347, 355–56, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992) (quoting *Wright*, 479 U.S. at 423, 107 S.Ct. at 770).

*Id.*

The Sixth Circuit decision in *Loschiavo* relied chiefly on the Supreme Court's decision in *Wright v. Roanoke Redevelopment and Hous. Authority. See id.; see also Bosscher v. Township of Algoma*, 246 F.Supp.2d 791, 797 (W.D.Mich.2003) (citing *Wright* and *Loschiavo* for the proposition that § 1983 could be used to enforce regulations "which have the force of law"). The current Sixth Circuit precedent treats regulations as "laws" under § 1983 and looks to determine whether the regulation at issue creates rights. In essence, regulations are treated in the same manner as statutes for purposes of determining whether they create new enforceable rights under § 1983. A such, district courts in the Sixth Circuit must determine, just as with federal statutes, whether federal regulations presented by § 1983 plaintiffs create enforceable rights.

This court questions whether the Sixth Circuit's rule can be correct in light of the Supreme Court's decisions in *Alexander v. Sandoval* and *Gonzaga University v. Doe. See Save Our Valley*, 335 F.3d at 937 (recognizing that these two recent Supreme Court decisions resolve the issue of whether federal regulations alone can create enforceable rights under § 1983). These two decisions, when read together, strengthen the legal foundation underlying the Third, Fourth, Fifth, Ninth, and Eleventh Circuit's reasoning in their decisions holding that administrative regulations cannot create rights enforceable under § 1983 by their own force. *Id.* at 937. Further, these decisions may undermine the Sixth Circuit's decision in *Loschiavo. Id.*

In *Alexander v. Sandoval*, the Court considered a challenge to the Alabama Department of Public Safety's policy which administered driver's license examinations only in English. The plaintiffs in *Sandoval* claimed that the policy violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and its implementing regulations because Alabama's policy had the effect of subjecting non-English speakers to discrimination based on their national origin. *Sandoval*, 532 U.S. at 279, 121 S.Ct. 1511. Section 601 of Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" receiving federal funds under Title VI. 42 U.S.C. § 2000d; *id.* at 278, 121 S.Ct. 1511. Section 602 of Title VI authorizes federal agencies to "effectuate the provisions of [§ 601]" by issuing regulations. The Department of Justice exercised its authority under § 602 and issued disparate-impact regulations. *Sandoval*, 532 U.S. at 278, 121 S.Ct. 1511; 49 C.F.R. § 21.5(b)(2) (2000). The Court had previously determined that Title VI created an implied

private cause of action to enforce § 601 of the Act, which prohibited *intentional* discrimination. *Sandoval*, 532 U.S. at 279–80, 121 S.Ct. 1511; *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). However, the plaintiffs' claim rested on the assertion of an implied private cause of action to enforce disparate-impact regulations passed under the authority of § 602. Because the *disparate impact* regulations were not consistent with the right to be free from *intentional* discrimination under § 601 of the statute, the issue considered by the Court was whether the statute created a private cause of action to enforce these disparate impact regulations. *Sandoval*, 532 U.S. at 279, 121 S.Ct. 1511.

The court rejected the plaintiffs' claim, focusing its analysis on the text of § 601 and § 602 and concluding that Congress did not express an intent to create an implied cause of action to enforce individual rights to be free from actions having a disparate impact on individuals based on their national origin. *Id.* at 286–87, 293, 121 S.Ct. 1511. The court found no "rights creating language in § 602 of the statute and that the regulations were not consistent with § 601's prohibition on intentional discrimination." *Id.* at 288–89, 121 S.Ct. 1511. Thus, no implied private right of action existed. *Id.* at 293, 121 S.Ct. 1511. In short, § 602 did not create enforceable rights for individuals covered by the statute to be free from actions that have a adverse effect or disparate impact based on national origin. Congress created a right to be free from intentional discrimination under Title VI.

More importantly, the *Sandoval* Court held that only Congress, by statute, can create a private right of action. It stated: "Language in a regulation may invoke a private right of action that *Congress through statutory text created, but it may*

*not create a right that Congress has not."*
*Id.* at 291, 121 S.Ct. 1511 (emphasis added). Although the *Sandoval* Court addressed federal rights in the context of implied private rights of action, its reasoning has implications for the creation of federal rights for § 1983 purposes. The Court's strong language suggests that only Congress can create individual rights of any kind, including those enforceable under § 1983. *Save Our Valley,* 335 F.3d at 937. In fact, the *Sandoval* Court never examined the regulations that purportedly created rights; instead the Court focused on Congressional intent as reflected in the text of the statute. The following language demonstrates the Court's focus on the statute in its rights-creating analysis.

> The judicial task is to interpret the *statute Congress has passed* to determine whether *it* displays an intent to create not just a private right but also a private remedy. *Statutory intent* on this latter point is determinative.
>
> .     .     .     .     .
>
> [I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action [including a right and a remedy] that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.

*Id.* at 286–87, 291, 121 S.Ct. 1511 (emphases added). These statements, although made in the context of the creation of implied causes of action under a federal statute, apply to the creation of federal rights. This is because an implied cause of action and § 1983 cause of action both require the creation of federal rights. As the Ninth Circuit has recently noted, "[b]oth implied rights of action and rights enforceable through § 1983 are creatures of federal substantive law. And it is an elementary principle of constitutional law that lawmaking is the province of Congress." *Save Our Valley,* 335 F.3d at 937.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Sandoval,* 532 U.S. at 286, 121 S.Ct. 1511. Because federal rights enforceable under § 1983 are creatures of federal substantive law, Congress must create them. The notion that federal regulations may create federal rights regardless of whether Congress created consistent statutory rights raises significant issues regarding fundamental concepts of separation of powers. Congress is the lawmaker, not the executive.

Furthermore, the Court's decision in *Gonzaga* appears to eliminate any doubt that rights enforceable under § 1983 must derive from the Constitution or federal statutes—not regulations. As noted above, the *Gonzaga* Court recognized that a court's implied right of action analysis and its determination of whether a statute creates enforceable rights under § 1983 "overlap in one meaningful respect—in either case we must first determine whether *Congress intended to create a federal right."* *Gonzaga,* 536 U.S. at 283, 122 S.Ct. 2268. Just like the Court in *Sandoval,* the *Gonzaga* Court suggested that federal rights were created by Congress in statutes, not by administrative agencies. Other decisions of the Supreme Court strengthen the conclusion that individual federal rights are created by Congress. The Court's jurisprudence focuses on whether *Congress* intended to create individual rights. *See Blessing,* 520 U.S. at 341, 117 S.Ct. 1353; *Wilder,* 496 U.S. at 509, 110 S.Ct. 2510; *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110–11, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); *Wright,* 479 U.S. at 430, 107 S.Ct. 766; *S. Camden Citizens in Action,* 274 F.3d at 784 ("[T]he Supreme Court [has] refined its analysis to focus directly on Congress'[s] intent to create enforceable rights . . . .").

The Sixth Circuit's holding in *Loschiavo* is also subject to challenge for two additional reasons. First, the *Loschiavo* decision appears to focus on the plain meaning of "laws" and relies on *Wright* to support its finding that regulations can create federal rights enforceable under § 1983 by their own force. The conclusion that regulations are "laws" simply because they have the force of law, however, should be compared to the plain meaning of the text of § 1983 which implicates "laws" that *secure* "rights, privileges, or immunities." Section 1983 provides a remedy for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." It does not provide a remedy for a violation of any federal law. Rather it is a vehicle to enforce those "laws" that secure federal rights, and Supreme Court jurisprudence has established that Congress must create those federal rights.

Second, *Loschiavo's* reliance on *Wright* may have been misplaced. *Wright* permitted a plaintiff to maintain a § 1983 action for violation of the Brooke Amendment and its regulations. The Brooke Amendment imposed a *statutory* limit on rent charged to low-income public housing tenants, and HUD promulgated regulations that defined the term "rent" to include reasonable utility costs. Although the Court in *Wright* permitted the plaintiffs to maintain an action under § 1983, the Court looked to the regulations at issue only to interpret the statutory right conferred on tenants by Congress. In fact,

the *Gonzaga* Court explained that the genesis of the right enforceable in *Wright* was the statutory provision of the Public Housing Act that "unambiguously conferred 'a mandatory [benefit] focusing on the individual family and its income.' " *Gonzaga,* 536 U.S. at 280, 122 S.Ct. 2268. Moreover, as the four dissenting Justices observed in *Wright,* the decision did not reach the question of whether an agency could create a right. In fact, the dissent noted that the notion that a regulation could create a right by its own force was "troubling." [9] As *Gonzaga* now makes clear, the decision in *Wright* does not stand for the proposition that regulations alone can create enforceable rights under § 1983. Rather, it comports with the better rule that permits federal regulations to "define" or "flesh out" existing statutory rights.

Although this court concludes that the LBPPPA and the provisions of the USHA cited by Plaintiff do not evince an unambiguous Congressional intent to create enforceable rights under § 1983, it must still look to the federal regulations cited by Plaintiff to determine if the regulations create enforceable rights.

### b. Whether the Regulations Cited by Plaintiff Create Enforceable Rights

██ Even when applying the Sixth Circuit view on whether administrative agencies can create enforceable rights in the absence of such creation by statute, the court concludes that the regulations cited

---

9. Justice Sandra Day O'Connor best expressed the dissent's concern as follows:

> I am concerned, however, that lurking behind the Court's analysis may be the view that, once it has been found that a statute creates some enforceable right, *any* regulation adopted within the purview of the statute creates rights enforceable in federal courts, regardless of whether Congress or the promulgating agency ever contemplated such a result. Thus, HUD's frequently

> changing views on how best to administer the provision of utilities to public housing tenants becomes the focal point for the creation and extinguishment of federal "rights." Such a result, where determination of § 1983 "rights" has been unleashed from any connection to congressional intent, is troubling indeed.

*Wright,* 479 U.S. at 438, 107 S.Ct. 766 (O'Connor, J., Dissenting).

do not provide the clear intent (more appropriately associated with a statute) to create federal rights in Plaintiff's favor. In examining the regulations at hand, the court must determine whether regulations, just as with statutes, create enforceable rights. Historically, courts in this circuit have applied the three factors set forth in *Blessing v. Freestone:*

First, Congress must have intended that the provision in question benefit the plaintiff.... Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence .... Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing v. Freestone,* 520 U.S. at 340–41, 117 S.Ct. 1353. However, in *Gonzaga* the Supreme Court has made clear that when considering whether statutes create enforceable rights under § 1983, Congressional intent must be clear and unambiguous and in explicit rights-creating terms. *Gonzaga,* 536 U.S. at 286–87, 122 S.Ct. 2268; *See also Bosscher,* 246 F.Supp.2d at 798 (applying the three factors of *Blessing* as modified by *Gonzaga* to an FCC declaratory ruling). In fact, in an unpublished decision, a panel of the Sixth Circuit recognized that *Gonzaga* has modified a court's inquiry when determining if federal rights exist for purposes of a § 1983 action. The Sixth Circuit stated:

While the district court's application of *Blessing* is not challenged on appeal, we nonetheless note that the Supreme Court has clarified that the "benefit" language in the first factor should not be construed to allow enforcement of a statutory provision merely because "the plaintiff falls within the general zone of interest that the statute is intended to

protect." *Gonzaga,* 536 U.S. at 283, 122 S.Ct. 2268. Instead, the question is whether the statutory provision contained the sort of " 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Id.* at 287, 122 S.Ct. 2268.

*Hughlett,* 2004 WL 435890 at *3, n. 3. In addition, at least one district court in the Sixth Circuit has recently applied the *Blessing* factors as modified by *Gonzaga* to a regulation to determine if the regulation created enforceable rights under § 1983. *Bosscher,* 246 F.Supp.2d at 798. In *Bosscher,* the Western District of Michigan examined whether a FCC declaratory ruling known as PRB–1 created enforceable rights under § 1983. *Id.* at 797–99. The plaintiff, a HAM radio operator, was denied a special use permit to erect a radio tower and he asserted, *inter alia,* a claim against the township for violating his rights under the FCC's regulatory ruling under § 1983. The district court noted the change to a court's § 1983 rights-creating inquiry in light of *Gonzaga* and concluded that the text of the PRB–1 regulatory ruling did not " 'unambiguously,' with 'explicit rights-creating terms,' indicate Congress' intent to confer individual rights on amateur radio operators." *Id.* at 798.

Likewise, this court will also apply the *Blessing* factors as modified by *Gonzaga.* Most of the language in the regulations, like the LBPPPA itself, focuses on the entity being regulated and does not contain the sort of rights-creating text required under *Gonzaga,* and the regulations lack the unambiguous rights creating language crucial to a court's inquiry in this regard. *Gonzaga,* 536 U.S. at 286–87, 122 S.Ct. 2268; *Hughlett,* No. 02–3886, 2004

First, 24 C.F.R. § 882.109 (1992) sets forth the housing quality standards for housing under Section 8. Section 882.109(i) implemented the provisions of the

LBPPPA at 42 U.S.C. § 4822 and stated that the purpose was to "eliminate as far as practicable the hazards of lead-based paint poisoning." However, this regulation does not contain the sort of rights-creating language demonstrating intent to create new rights.

Second, 24 C.F.R. § 882.116 (1992) described the responsibilities of a public hosing agency in administering an ACC with HUD. The PHA was responsible for inspections to determine that housing units were maintained in "Decent, Safe, and Sanitary condition," and for notifications to property owners and families of the public housing agency's determinations. 24 C.F.R. § 882.116(o) (1992). This regulation also made the public housing agency (the DHC) responsible for the administration and enforcement of "Contracts with Owners" and for "taking appropriate actions in case of noncompliance or default." *Id.* Although this regulation defines certain responsibilities for a PHA, it does not express an unambiguous intent to create enforceable rights for Section 8 tenants.

Third, 24 C.F.R. § 882.211 (1992) discussed the maintenance, operation, and inspections under the Section 8 housing assistance payment program. It requires a public housing agency to inspect dwelling units to ensure that the owner of the property is meeting its obligations to maintain the housing in decent, safe, and sanitary condition. 24 C.F.R. § 882.211(b). However, if an owner fails to maintain a dwelling unit in such condition, the *"PHA may exercise any of its rights and remedies under the Contract,* including termination of housing assistance payments and termination of the contract." *Id.* (emphasis added). This regulation focuses on what actions the PHA may take; it does not, however, include rights creating language in favor of tenants. *See* 24 C.F.R. § 882.211(c) (1992).

Next, 24 C.F.R. § 882.209 (1992) addressed the selection and participation for the Section 8 housing assistance payment program. Section 882.209(h) requires that the PHA inspect a unit for compliance with housing quality standards as set forth in § 882.109 or cause such an inspection to be made. If there were deficiencies, the PHA was required to advise the owner of the work to be done and occupancy of such a dwelling requiring work could "be assisted under this Part only after such repairs [had] been made." 24 C.F.R. § 882.209(h)(2). This regulation also focuses on the eligibility of federal assistance to the owner of the property. It does not create enforceable rights in Section 8 tenants.

Lastly, 24 C.F.R. § 35 *et seq.* does not give rise to enforceable rights under § 1983. The relevant provisions of addressing the requirements under 24 C.F.R. § 35 state:

### 35.20   Purpose and scope.

This Subpart C implements the provisions of section 302 of the Act with respect to establishing procedures to eliminate as far as practicable the hazards of lead-based paint poisoning with respect to any existing HUD-associated housing which may present such hazards.

### 35.24   Requirements.

(a) Each Assistant Secretary shall establish procedures with respect to programs involving HUD-associated housing within his or her administrative jurisdiction to eliminate as far as practicable the hazards of lead-based paint poisoning with respect to housing that may present such hazards.

(b) Subject to the provisions of separate regulations promulgated with respect to any program by the Assistant Secretary having jurisdiction over that program,

the following minimum requirements shall apply to all programs:

(1) All applicable surfaces of HUD-associated housing constructed prior to 1978 shall be inspected to determine whether defective paint surfaces exist.

(2)(i) Treatment necessary to eliminate immediate hazards shall, at a minimum, consist of the covering or removal of defective paint surfaces found in HUD associated housing constructed prior to 1978.(ii) Covering may be accomplished by such means as adding a layer of wallboard to the wall surface. Depending on the wall condition, wallcoverings which are permanently attached may be used. Covering or replacing trim surfaces is also permitted. Paint removal may be accomplished by such methods as scraping, heat treatment (infra-red or coil type heat guns) or chemicals. Machine sanding and use of propane or gasoline torches (open-flame methods) are not permitted. Washing and repainting without thorough removal or covering does not constitute adequate treatment. In the case of defective paint spots, scraping and repainting the defective area is considered adequate treatment.

(3) Appropriate provisions for the inspection of applicable surfaces and elimination of hazards shall be included in contracts and subcontracts involving HUD-associated housing to which such requirements may apply.

(4) Any requirements of this section shall be deemed superseded by a regulation promulgated by an Assistant Secretary with respect to any program under his or her jurisdiction which states expressly that it is promulgated under the authorization granted in this section and supersedes, with respect to programs with-

in its defined scope, the requirements prescribed by this section. *See, e.g.,* 24 CFR Part 200, Subpart O (Mortgage Insurance and Property Disposition); s 570.608 (Community Development Block Grant); s ·882.109(i) (Section 8 Existing Housing); Part 965, Subpart H (Public Housing), part 905, subpart K (Indian Housing).

**35.5 Requirements.**

(a) Purchasers and tenants of HUD-associated housing constructed prior to 1978 shall be notified:

(1) That the property was constructed prior to 1978;

(2) That the property may contain lead-based paint;

(3) Of the hazards of lead-based paint;

(4) Of the symptoms and treatment of lead-based paint poisoning; and

(5) Of the precautions to be taken to avoid lead-based paint poisoning (including maintenance and removal techniques for eliminating such hazards).

Prospective purchasers or renters shall receive the above notifications prior to purchase or rental.

(b) Each Assistant Secretary shall take necessary actions to implement the requirements of paragraph (a) of this section with respect to the HUD programs within his/her administrative jurisdiction. Such actions shall include providing the required notification (prepared by the Secretary after consultation with the National Institute of Building Sciences) and establishing procedures to:

(1) Provide evidence that the required notification has been received by purchasers and tenants of HUD-associated housing constructed prior to 1978, and

(2) Require the inclusion of appropriate provisions in contracts of sale, rental or management of HUD-associated housing to assure that purchas-

ers and tenants receive the required notification.

(c) Any requirement of this section, except use of the required notification, shall be deemed superseded by a regulation promulgated by an Assistant Secretary with respect to any program under his or her jurisdiction which states expressly that it is promulgated pursuant to the authorization granted in this section and supersedes, with respect to programs within its defined scope, the notification requirements prescribed by this section. *See. e.g.*, 24 CFR 570.680(b) (Community Development Block Grants).

24 C.F.R. §§ 35.20, 35.24, 35.5 (1992).

These regulations also lack the rights-creating language which unambiguously indicates an intent to create federal rights enforceable by tenants. With the exception of the notice-of-hazard provision under § 35.5,[10] the regulations focus on the entity being regulated and describe the actions to be taken to eliminate the hazard of lead-based paint poisoning "as far as practicable." These regulations track much of the statutory language of the LBPPPA inasmuch as they focus on the implementation of certain procedures by HUD and public housing authorities to protect against the hazard of lead-based paint; however like the statute itself, the LBPPPA regulations do not convey an unambiguous intent to create individual rights enforceable under § 1983. As such, even if these federal regulations could create enforceable rights with out unambiguous *Congressional* in-

tent, the regulations cited by Plaintiff do not provide enforceable rights for purposes of § 1983. *See Gonzaga*, 536 U.S. at 290, 122 S.Ct. 2268.

### 4. *Monell* Claims under § 1983

■■■ Defendants also claim that Plaintiff's complaint fails to state a claim for municipal liability under § 1983 because it "is devoid of allegations that the deprivation was caused by a municipal policy, custom, or usage as required by *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)." (Defs.' Reply at 1.) In order to state a claim against the municipal Defendants, Plaintiff must allege the existence of a policy, practice, or custom that resulted in the injury claimed. *Monell*, 436 U.S. at 690, 98 S.Ct. 2018. However, the court need not consider this argument for two reasons. First, the issue was not presented as a basis for dismissal in Defendants' motion. Rather, it was asserted in their reply brief and Plaintiff has not been afforded an opportunity to respond. Second, even assuming that Plaintiff's complaint did allege a policy, practice, or custom of the City or the DHC (or assuming the court granted leave to file an amended complaint containing such a claim), Plaintiff still fails to state a claim because the statutes cited by Plaintiff do not create enforceable rights under § 1983, nor does the LBPPPA or the USHA create an implied cause of action. Accordingly, the court will grant Defendants' motion to dismiss Plaintiff's claims asserted in Counts I and II pursuant to 42 U.S.C. § 1983.[11]

---

10. Although the notice of hazards regulation, 24 C.F.R. § 35.5(a), focuses on purchasers and tenants of HUD housing in stating that they "shall be notified," this language, when considered in the context of the other regulations and the statutory text, does not unambiguously demonstrate intent to confer enforceable rights.

11. The court will also grant Defendant's motion to dismiss Count III which alleges a breach of the LBPPPA itself. The LBPPPA does not create an implied private right of action. First, as discussed above the statute does not confer enforceable rights on Plaintiff. Moreover, the LBPPPA also does not create an implied remedy. *See Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Lindsay*, 1999 WL 104599 at *4 (find-

## B. Plaintiff's Third Party Beneficiary Claim (Count IV)

In Count IV of the complaint, Plaintiff asserts a claim against Defendants City of Detroit and DHC for breach of the ACC made between Defendants and HUD. Plaintiff asserts the breach of contract claim as a third-party beneficiary to the ACC. Although neither party takes a firm position regarding whether Michigan law or federal common law applies to this claim, the court will initially determine whether state or federal common law applies.

■■■ A claim for breach of contract is generally a state-law claim and federal common law rarely displaces state substantive law in an action between private parties. *See Miree v. DeKalb County*, 433 U.S. 25, 27, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("There is no federal general common law."). However, federal common law may govern, even in diversity cases, where a uniform national rule is necessary to further the interests of the Federal Government. *Miree*, 433 U.S. at 29, 97 S.Ct. 2490 (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943)).

The Supreme Court considered whether federal common law or state law governed a parties' third-party beneficiary claim in *Miree v. DeKalb County*. In *Miree*, the plaintiffs sought to impose liability on the defendant based on a contract between it and the Federal Aviation Administration ("FAA"). The plaintiffs claimed to be third-party beneficiaries under six grant agreements that defendant had entered

into with the FAA. *Miree*, 433 U.S. at 27, 97 S.Ct. 2490. Under the agreements, the defendant was required to "take action to restrict the use of land adjacent to or in the immediate vicinity of the Airport." *Id.* The plaintiffs, survivors of deceased passengers of a jet that crashed after takeoff from DeKalb–Peachtree Airport, claimed that the defendant breached its FAA contracts by owning and maintaining a garbage dumb adjacent to the airport.

The Supreme Court ruled that state law applied, notwithstanding the fact that the contracts involved included the United States as a party and were entered into pursuant to authority conferred by federal statute. *Id.* at 28, 30, 97 S.Ct. 2490. The Supreme Court noted: "The litigation before us raises no question regarding the liability of the United States or the responsibilities of the United States under the contracts." *Id.* at 28–29, 97 S.Ct. 2490. The Court further stated "the resolution of [plaintiffs'] breach-of-contract claim against [the defendant] will have no effect upon the United State or its Treasury." *Id.* at 29, 97 S.Ct. 2490.

■■■ Likewise, the resolution of Plaintiff's claim against the City of Detroit and the DHC raises no question regarding the liability of the United States or the responsibilities of the United States under the ACC. Plaintiff does not name the United States as a party and its rights under the ACC will not be affected. *Cf. Holbrook v. Pitt*, 643 F.2d 1261, 1270 n. 16 (7th Cir. 1981) (holding that federal common law applied to third-party beneficiary claim by tenants of Section 8 housing because federal agency was a party to the action and

ing no implied remedy under LBPPPA) (The Act provides mechanisms to ensure property owners' compliance by the public housing agency, for example by withholding Section 8 payments for terminating contracts. "This enforcement scheme supports the view that

Congress intended HUD to bear the primary responsibility for ensuring compliance with all program requirements."); *see also Roseberry*, 736 F.Supp. at 410 (finding no implied cause of action under the LBPPPA).

outcome of the case directly affected financial obligations of the United States).[12] Accordingly, Michigan law will apply to Plaintiff's claim for breach of contract as a third-party beneficiary.

### C. Plaintiff's Supplemental State Law Claims

The court has determined that the dismissal of Plaintiff's federal question claims is proper under Federal Rule of Civil Procedure 12(b)(6). Counts I and II fail to state a claim because the statute and regulations cited do not create enforceable rights under 42 U.S.C. § 1983. Count III fails to state a claim because the LBPPPA does not provide an implied private cause of action. The remaining claims are state law claims, which the court does not have independent original jurisdiction over. As discussed above, Count IV is a state claim for breach of contract as a third-party beneficiary. Count V alleges a breach of statutory duties under Michigan Compiled Laws § 554.139. Count VI asserts a common law negligence claim, and Count VII alleges nuisance per se.[13]

The court currently has jurisdiction over these remaining state law claims through the exercise of supplemental jurisdiction as set forth in 28 U.S.C. § 1367. Section 1367 provides, in part:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III.

Supplemental jurisdiction under 28 U.S.C. § 1367, however, "is a doctrine of discretion, not of plaintiff's right." *MacDonald v. United States*, 2003 WL 22073159, *2 (E.D.Mich. July 21, 2003) (citing *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir.2003)). Section 1367(c) specifically provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law;
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) *the district court has dismissed all claims over which it has original jurisdiction,* or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis added).

Upon review of the remaining state law Counts, it appears that Plaintiff's supplemental state law claims will require significant interpretation and analysis under Michigan law and the court finds these matters are best handled by the Michigan state courts. As such, the court will employ its discretion under 28 U.S.C. § 1367(d) and will dismiss Plaintiff's remaining supplemental claims without prejudice.

---

12. In *Holbrook,* the Seventh Circuit distinguished *Miree v. DeKalb* because the United States was not a party to the case in *Miree.* 643 F.2d at 1270 n. 16. Only the rights of litigants other than the United States were at issue in *Miree.* Likewise, in this case Plaintiff only seeks to enforce the ACC against the City of Detroit and the DHC.

13. The court will also not consider Defendant's claim that the DHC is not a proper party under Michigan law because it is part of the City of Detroit. Whether the DHC is a proper party is not relevant to the federal claims because the court has determined that Plaintiff has failed to state a claim for violation of rights enforceable under § 1983.

The parties should also note the tolling provisions found in 28 U.S.C. § 1367(d). Section 1367(d) states, in relevant part, "the period of limitations for any claim asserted under subsection (a) ... shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." Furthermore, the U.S. Supreme Court has recently upheld the constitutionality of § 1367(d) and determined that its tolling provisions also apply to claims brought against a State's political subdivisions. *Jinks v. Richland County,* 538 U.S. 456, 123 S.Ct. 1667, 1672–73, 155 L.Ed.2d 631 (2003). The Court stated "[t]o prevent the limitations period on such supplemental claims from expiring while the plaintiff was fruitlessly pursuing them in federal court, § 1367(d) provides a tolling rule that must be applied by state courts." *Id.* at 1669.

## IV. CONCLUSION

IT IS ORDERED that Defendants' March 5, 2004 "Motion to Dismiss Complaint for Failure to State a Claim Upon which Relief Can be Granted" [Dkt. # 8] is GRANTED IN PART. It is GRANTED with respect to Counts I, II, and III.

IT IS FURTHER ORDERED that Counts IV, V, VI, and VII of Plaintiff's complaint are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367.